# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| B.N., by his mother and next friend A.N., on behalf of himself and a class of those similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CAUSE NO.: 3:09-CV-199-TLS |
| ANNE WALTERMANN MURPHY, *et al*, | ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

The Plaintiff, B.N., on behalf of himself and a putative class of others similarly situated, has sued Anne Waltermann Murphy, in her official capacity as Secretary of the Indiana Family and Social Services Administration; Pat Casanova, in her official capacity as Interim Director of the Office of Medicaid Policy and Planning; and Megan Ornellas, in her official capacity as Director of the Division of Aging. The Plaintiff asks for declaratory and injunctive relief because a 2008 policy by the Indiana Family and Social Services Administration limits the number of hours of respite care services per month available to individual enrollees under the Aged and Disabled Waiver program. B.N., through his mother A.N., filed suit in LaPorte County, Indiana, on April 14, 2009, alleging violations of the Americans with Disabilities Act of 1990, the Rehabilitation Act of 1973, federal Medicaid law, and the Indiana Code's promulgation requirements. On May 1, 2009, the Defendants removed the case to this Court pursuant to 28 U.S.C. § 1331 and § 1367. On June 11, 2009, the Plaintiff filed a First Amended Class Action Complaint for Declaratory and Injunctive Relief [ECF No. 20], alleging the same violations as before, and additionally alleging violation of Indiana state Medicaid law. Also on June 11, the Plaintiff filed an Amended Motion for Class Certification [ECF No. 21] with a corresponding

Memorandum of Law in Support of Amended Motion for Class Certification [ECF No. 22]. On June 29, 2009, the Defendants filed Defendants' Memorandum of Law in Opposition to Plaintiff's Amended Motion for Class Certification [ECF No. 25], and after subsequent investigation filed Defendants' Supplemental Brief and Evidentiary Materials in Opposition to Plaintiff's Amended Motion for Class Certification [ECF No. 35]. The Plaintiff responded on October 15, 2009, with Plaintiffs' Reply in Support of Amended Motion for Class Certification [ECF No. 38]. In an Opinion and Order dated September 27, 2011 [ECF No. 72], this Court denied the Plaintiff's Amended Motion for Class Certification because the Plaintiff failed to establish the numerosity required to bring a class action under Rule 23(a)(1).

The Plaintiff filed a Motion for Summary Judgment on October 15, 2009 [ECF No. 39], along with a Memorandum in Support [ECF No. 40]. The Defendants responded with their own Motion for Summary Judgment on December 31, 2009 [ECF No. 45], along with a Brief in Support [ECF No. 46]. The Plaintiff filed a Reply on January 25, 2010 [ECF No. 49]. On March 8, 2010, the Clay Superior Court, Clay County, Indiana, granted summary judgment to a class of plaintiffs similarly-situated to the Plaintiff, in a case involving a nearly-identical state policy [ECF No. 50-4]. This Court granted the Plaintiff leave to file a brief discussing collateral estoppel. The Plaintiff filed such a brief on April 30, 2010 [ECF No. 55], the Defendants responded on May 14, 2010 [ECF No. 58], and the Plaintiff replied on May 24, 2010 [ECF No. 62]. The parties agree there are no facts in dispute and this case is ready to be resolved on the cross Motions for Summary Judgment.

**BACKGROUND**

The Plaintiff is a severely handicapped minor[1] who resides in LaPorte County, Indiana. He lives with his parents, and due to cerebral palsy and other developmental handicaps, requires nearly constant care. He cannot walk, talk, or eat, and is therefore fed by a tube inserted into his small intestine. Additionally, he cannot toilet, and therefore still wears diapers.

Indiana participates in the federal Medicaid program, providing medical services to many low-income individuals through the Indiana Family and Social Services Administration. To receive federal matching funds, Indiana's Medicaid program must be approved by the United States Department of Health and Human Services. Under federal Medicaid law, the Department of Health and Human Services may waive certain Medicaid requirements for states that provide "home or community-based services" for individuals who would otherwise require institutionalizing as long as:

> the average per capita expenditure estimated by the State in any fiscal year for medical assistance provided with respect to such individuals does not exceed 100 percent of the average per capita expenditure that the State reasonably estimates would have been made in that fiscal year for expenditures under the State plan for such individuals if the waiver had not been granted.

42 U.S.C. § 1396n(c)(2)(D). In early 2008, the Indiana Family and Social Services Administration submitted a waiver request to the Department of Health and Human Services. One of the waiver provisions was a sixty hour per month limit on respite care services available to individuals enrolled in Indiana's Aged and Disabled Waiver program. Prior to this waiver provision, many individuals in Indiana were being approved for more than sixty hours per month in respite care services. In May 2008, the Department of Health and Human Services approved

---

[1] In June 2009, B.N. was eight years old. (First Am. Verified Class Action Compl. for Declaratory and Injunctive Relief, ¶ 25, ECF No. 20.)

Indiana's requested waiver, and the sixty hour limitation went into effect in July 2008. It is undisputed that the state undertook no studies to determine the probable effect of its cap on those receiving care under the Waiver program. (Filler Dep. 76–77, ECF No. 39-3.) In her deposition, Karen Filler, Deputy Director of the Division of Aging, stated that the purpose of the caps was to fund services through the Medicaid prior authorization program instead of the waiver program (*Id.* 126–28 ("[the cap on respite services] was not meant to curtail any services to individuals, it was only meant to make sure that the proper funding sources were used.").) It is also undisputed that although the cost of care in the community versus the cost of institutionalizing was noted in the application for waiver services, cost of community care did not determine whether the state gave waiver services. (*Id.* 18–19.) Finally, it is undisputed that the state made no effort to promulgate the sixty-hour cap on respite services in accordance with Indiana's Administrative Rules and Procedures Act (ARPA), Ind. Code § 4-22-2-1, *et seq.* (Defs.' Resps. to Pl.'s Interrogs. ¶ 3, ECF No. 39-6.)

The evidence before the Court shows that many individuals in Indiana are eligible to receive funding for home or community-based services through the Medicaid prior authorization program, and that—as the agency intended—many individuals in Indiana who were previously approved for more than sixty hours of respite care services under the Aged and Disabled Waiver program were able to find providers and funding for the hours they needed in excess of sixty hours through the Medicaid prior authorization program. (Def.'s Mem. of Law Opp'n Pl.'s Am. Mot. for Class Certification 2, ECF No. 25.) However, the evidence also shows that at least thirteen individuals were unable to obtain replacement funding through the Medicaid prior authorization program when the state began enforcing the sixty hour cap on respite care services.

(Pl.'s Reply Supp. Mot. Summ. J. 3, ECF No. 49; Filler Dep. 143.) The Plaintiff is one of the individuals who could not obtain replacement services through prior authorization.

Prior to 2008, the Plaintiff received a combination of in-home nursing services. He received fifty hours per month of in-home nursing services through the Medicaid prior authorization program, but these services were only available during the day on weekdays. He also received eighty hours per month of respite care services through the Aged and Disabled Waiver program. When the sixty hour per month cap went into effect, the Plaintiff applied for eighty hours of respite care services per month and was denied. He subsequently applied for sixty hours of respite care services per month and that request was approved. Because of the specifics of the Plaintiff's case, he was unable to make up the difference with funding from the Medicaid prior authorization program.  Some of the reasons that the Plaintiff and others could not get prior authorization funding for the needed hours in excess of sixty include limited numbers of licensed prior authorization providers, limited geographic dispersion of prior authorization providers, and limited ability of prior authorization providers to take on new clients or hours. (Filler Dep. 83–85, 138–39.)

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure provide that motions for summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that

party.'" *AA Sales & Assocs. v. Coni-Seal, Inc.*, 550 F.3d 605, 608–09 (7th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). Under Rule 56(e)(2), a party opposing a properly made and supported motion for summary judgment "may not rely merely on allegations or denials in its own pleading; rather its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." If appropriate, summary judgment should be entered against a party who fails to so respond. Fed. R. Civ. P. 56(e)(2); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (holding that a court should enter summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). A court's role on summary judgment is not to weigh the evidence, make credibility determinations, or decide which inferences to draw from the facts, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 255; *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Thus, a court in ruling on a summary judgment motion construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *AA Sales & Assocs.*, 550 F.3d at 609. However, the court is not required to draw every conceivable inference from the record—only reasonable ones. *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 886 (7th Cir. 1989). Under local rule, facts that are submitted by the moving party and supported by admissible evidence are considered to exist without controversy, except to the extent that such facts are controverted in a "Statement of Genuine Issues" filed in opposition to the motion. L.R. 56.1.

**DISCUSSION**

The Plaintiff offers four bases for declaratory and injunctive relief against the 2008 policy capping respite care services at sixty hours per month under the Aged and Disabled Waiver program. The Plaintiff argues: 1) the policy is a "rule" within the meaning of the Indiana Administrative Rules and Procedures Act (ARPA), and violates the ARPA because it has not been properly promulgated; 2) the policy violates the Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973 because it will have the effect of forced institutionalization when the state could reasonably accommodate the Plaintiff in his home; 3) the policy violates state Medicaid law because State of Indiana Medicaid programs must pay for medically necessary services; and 4) the policy violates federal Medicaid law because federal regulations require states to provide coverage for medically necessary services. The Defendants urge that: 1) either the policy is not a rule, or it was promulgated as part of an earlier Indiana rule; 2) the policy does not violate the ADA or the RA because services are still available under prior authorization, and because the policy is neutral on its face; 3) the policy does not violate state Medicaid law because services are available through prior authorization; and 4) the policy does not violate federal Medicaid law because it was approved by the Department of Health and Human Services, and the Court should defer to the agency's interpretation of the statute and regulations it is charged with administering. Because the Court determines that the Plaintiff is entitled to relief on multiple bases, the Court will grant the Plaintiff's Motion for Summary Judgment.


**A.      The State Policy Violates Indiana's Administrative Rules and Procedures Act**

Under Indiana's ARPA, state administrative agencies may issue rules having the effect of

law as long as those rules are properly promulgated. Ind. Code § 4-22-2-13 *et seq.* Promulgation requires publishing notice of intent to adopt a rule, *id.* § 4-22-2-23, publishing notice of a public hearing on the rule, *id.* § 4-22-2-24, conducting a public hearing and allowing public comment, *id.* § 4-22-2-26, formally adopting a rule consistent with the published rule, *id.* § 4-22-2-29, submitting the proposed rule to the attorney general for legal review, *id.* § 4-22-2-31 & 32, submitting the proposed rule to the governor for approval, *id.* § 4-22-2-33 & 34, and submitting the proposed rule to the secretary of state for publishing, *id.* § 4-22-2-35. A rule that is improperly promulgated is invalid and does not have the effect of law. *Id.* § 4-22-2-44; *Ind.-Ky. Elec. Corp. v. Comm'r, Ind. Dept. Of Envtl. Mgmt.*, 820 N.E.2d 771, 780 (Ind. Ct. App. 2005) (invalidating a rule that was not properly promulgated). Indiana law defines a "rule" as "the whole or any part of an agency statement of general applicability that . . . has or is designed to have the effect of law; and . . . implements, interprets, or prescribes . . . law or policy; or . . . the organization, procedure, or practice requirements of an agency." Ind. Code § 4-22-2-3(b).

The Defendants argue that the state's sixty hour cap on respite services is merely an internal policy and does not amount to a rule, but this argument fails.[2] The state's sixty hour cap has general applicability to all individuals in Indiana receiving services under the Aged and Disabled Waiver program. The cap is designed to have the effect of law, and it implements law in

---

[2]The Plaintiff argues in his Supplemental Brief Addressing Collateral Estoppel Effect of Supplemental Authority [ECF No. 55] that the Defendants' only argument on the question of promulgation under the ARPA is that the sixty hour cap was previously promulgated, and thus that collateral estoppel is appropriate because the Defendants' only argument is precluded. This is not accurate. The Defendants also argue in opposition to the Plaintiff's Motion for Summary Judgment that the sixty hour cap is not a "rule" within the meaning of the term under the ARPA. (Defs.' Br. Supp. Mot. Summ. J. 8, ECF No. 46.) Thus, the Court determines that collateral estoppel is inappropriate, and, in any case, since the Court agrees with the Plaintiff that the sixty hour cap does not comport with the promulgation requirements of the ARPA, the Court finds the issue of collateral estoppel to be moot.

a way that affects substantive rights by denying services to which individuals would otherwise be entitled. Such a cap meets the definition of a rule under Indiana law, is more than a merely internal policy, and, absent promulgation, is invalid. *Blinzinger v. Americana Healthcare Corp.*, 466 N.E.2d 1371, 1375 (Ind. Ct. App. 1984) (finding invalid an unpromulgated agency directive which applied generally, prospectively, with the effect of law, and which affected substantive rights); *Ind. Dept.of Envtl. Mgmt. v. AMAX, Inc.*, 529 N.E.2d 1209, 1212–13 (Ind. Ct. App. 1988) (finding invalid an unpromulgated agency policy that applied generally, prospectively, and with the effect of law).

The Defendants also argue that proper promulgation of Title 460 of the Indiana Administrative Code incorporates by reference the sixty hour cap on respite care services, and thus the cap has been promulgated consistent with the ARPA. This argument fails because Title 460 was promulgated more than a year before the sixty hour cap went into effect. Title 460 was promulgated by the Indiana Family and Social Services Administration in September 2006, and it included language describing Medicaid waiver programs for "home and community based services for the aged and disabled." 460 Ind. Admin. Code 1.2-3-1(a)(1). But the sixty hour cap on respite services was not proposed until 2008, (Filler Dep. 34–36), and when it was approved, it was assigned a different control number from the waiver provision that was promulgated in Title 460 of the Indiana Administrative Code. *Compare* 460 Ind. Admin. Code 1.2-3-1(a)(1) *with* CMS Approval Letter, Filler Dep. Ex. 8, ECF No. 39-4. The Defendants' argument that the cap was previously promulgated fails because the previous reference was to an entirely different waiver program. The sixty hour cap on respite services which was approved by the Department of Health and Human Services in 2008 has never been properly promulgated under Indiana law, and is

therefore void. Accordingly, the Plaintiff is entitled to judgment on the basis of the Defendants' failure to comply with the provisions of the Indiana ARPA.

**B.      The State Policy Violates the ADA and the RA**

The Americans with Disabilities Act of 1990 (the ADA) states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA defines a qualified individual with a disability as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Id*. § 12131(2). The ADA defines a public entity as "any State or local government" or "any department, agency . . . or other instrumentality of a State . . . or local government." *Id.* § 12131(1). The Rehabilitation Act of 1973 (the RA) has a similar provision, prohibiting discrimination against disabled individuals by any entity receiving federal funding. 29 U.S.C. § 794. Because of the similar language in the ADA and the RA when applied to public entities receiving federal funding, courts "construe the two provisions as co-extensive." *Sanchez v. Johnson*, 416 F.3d 1051, 1062 (9th Cir. 2005); *see also Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 607 (7th Cir. 2004) ("courts construe and apply [the ADA and the RA] in a consistent manner"); *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002) (outlining the provisions of the ADA and the RA, and finding that the same conduct violated both); *Helen L. v. DiDario*, 46 F.3d 325, 331–32 (3d Cir. 1995) (discussing the similarities between the ADA and the RA).

Both the ADA and the RA contain an integration mandate. The ADA requires a public entity to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The RA requires an entity receiving federal funding to "administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d).

The Supreme Court has analyzed the integration mandate of the ADA. In *Olmstead v. Zimring*, 527 U.S. 581 (1999), the court addressed the question of "whether the proscription of discrimination may require placement of persons with mental disabilities in community settings rather than in institutions." *Id.* at 587. The court held that the answer was "a qualified yes," such action being required when:

> the State's treatment professionals have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

*Id.* Stated differently, "[u]njustified isolation . . . is properly regarded as discrimination based on disability." *Id.* at 597. The court noted that not all requests for accommodation are reasonable. A state "[can] resist modifications that 'would fundamentally alter the nature of the service, program, or activity.'" *Id.* (quoting 28 C.F.R. § 35.130(b)(7)). The *Olmstead* court also directed that a court evaluating a fundamental alteration defense "must consider, in view of the resources available to the State, not only the cost of providing community-based care to the litigants, but also the range of services the State provides others with mental disabilities, and the State's obligation to mete out those services equitably." *Id.* Finally, the *Olmstead* court rejected the State's argument that a facially-neutral policy could not violate the ADA. In response to the

11

State's facial neutrality argument, the court responded: "We are satisfied that Congress had a more comprehensive view of the concept of discrimination advanced in the ADA." *Id.* at 598. As the Seventh Circuit has explained, unjustified isolation violates the ADA "even in the absence of traditional proof that the disabled person is being treated differently from a nondisabled person who is otherwise similarly situated." *Radaszewski*, 383 F.3d at 607–08. In a case involving the potential for forced institutionalization, this Court must apply the *Olmstead* court's analysis of the integration mandate under the ADA and the RA.

The Defendants do not appear to challenge a co-extensive analysis of the ADA and the RA, and the Court will analyze the two co-extensively. Further, the Defendants admit the applicability of the integration mandate under both the ADA and the RA. The Defendants even cite *Olmstead's* three-part test for when community placement is required under the integration mandate. But the Defendants decline to apply the three-part test to this case, arguing instead that their conduct does not violate the ADA and the RA for a number of reasons.

First, the Defendants argue that the sixty hour cap will not have the effect of forced institutionalization because those whose respite hours are curtailed may continue to receive funding through the Medicaid prior authorization system. The Defendants' argument fails because the facts before the Court show just the opposite. The facts as shown by the Plaintiff, uncontroverted by the Defendants, are that at least thirteen individuals in Indiana, including the Plaintiff, have been unable to make up the rest of their medically necessary hours through prior authorization. Because it is clear from the record that the state's policy will have the effect of forced institutionalization of the Plaintiff, the only question is whether accommodation of the Plaintiff is reasonable under an *Olmstead* analysis. The Court will return to the *Olmstead* test

12

momentarily.

The Defendants argue, secondly, that the sixty hour cap is permissible because the state agency did not intend to force the institutionalization of Medicaid recipients. Rather, the state's goal was merely to fund medically necessary services through prior authorization instead of through waiver services. The Plaintiff counters that intent is irrelevant when the effect of a policy is to violate the ADA and the RA. The Court agrees. The Supreme Court has held that the RA was designed to prevent not just purposeful discrimination, but discrimination arising from "benign neglect." *Alexander v. Choate*, 469 U.S. 287, 295 (1985). The reason the RA must proscribe policies which inadvertently discriminate against the handicapped is that "much of the conduct that Congress sought to alter in passing the Rehabilitation Act would be difficult if not impossible to reach were the Act construed to proscribe only conduct fueled by a discriminatory intent." *Id.* at 296–97. The same logic applies to the ADA. As the Third Circuit has explained, "[b]ecause the ADA evolved from an attempt to remedy the effects of 'benign neglect' resulting from the 'invisibility' of the disabled, Congress could not have intended to limit the Act's protections and prohibitions to circumstances involving deliberate discrimination." *Helen L.*, 46 F.3d at 335. Insofar as the Defendants argue explicitly and implicitly that their lack of discriminatory animus should save the sixty hour cap under the ADA and the RA, the Court rejects that argument.

Next, the Defendants argue that *Olmstead* does not require a certain standard of care under the ADA, but merely requires "that States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide," *Olmstead*, 527 U.S. at 603 n.14, and that by asking the state to prevent his institutionalization, the Plaintiff is asking for a standard of

13

care not required by the ADA. The Defendants' argument continues with an exposition of the facial neutrality espoused by the Supreme Court in *Alexander v. Choate*. In *Alexander*, the court held that a Tennessee Medicaid cap on the number of days reimbursable for inpatient hospital stays did not violate the RA because it applied equally to handicapped and non-handicapped individuals. *See Alexander*, 469 U.S. at 303. The court continued, "[t]o conclude otherwise would be to find that the Rehabilitation Act requires States to view certain illnesses, *i.e.* those particularly affecting the handicapped, as more important than others." *Id.* at 303–04. Finally, the *Alexander* court noted that "[the RA] does not, however, guarantee the handicapped equal results from the provision of state Medicaid, even assuming some measure of equality of health could be constructed." *Id.* at 304. The Defendants argue that because the sixty hour cap is neutral on its face, it does not violate the ADA or the RA even if it has the effect of forced institutionalization.

The Defendants' argument fails because *Olmstead* has set a higher bar for cases of forced institutionalization. Notably, *Alexander* did not involve forced institutionalization, so that court's holdings are distinguishable from *Olmstead*, where the Supreme Court set out an unequivocal application of the integration mandate for forced institutionalization cases. Even before *Olmstead*, the Third Circuit noted that the integration mandate would require a different result from a pure facial neutrality analysis. *Helen L.*, 46 F.3d at 336 (discussing *Traynor v. Turnage*, 485 U.S. 535 (1988)—another Supreme Court case espousing facial neutrality under the RA—the Third Circuit pointed out that "the [*Traynor*] court was not concerned with the application of the integration mandate, or anything analogous to it, and the holding is not germane to our analysis."). In fact, the facial neutrality argument was espoused again by the *Olmstead* <u>dissent</u>, which specifically referenced the *Alexander* facial neutrality standard, arguing that facial neutrality should remain

14

the law. *Olmstead*, 527 U.S. at 619 (Thomas, J., dissenting). But the *Olmstead* court expressly rejected that argument when it stated that "Congress had a more comprehensive view of the concept of discrimination advanced in the ADA." *Id.* at 598. The *Olmstead* majority called the dissent's notion of facial neutrality as well-established precedent "incorrect as a matter of precedent and logic." *Id.* at 598 n.10. The *Olmstead* test—which the Defendants did not apply in their brief—is the law.

Applying the three-part test from *Olmstead*, the first two requirements are unquestionably met. First, the state's treatment professionals have already determined that community placement is appropriate for the Plaintiff; and second, the Plaintiff does not oppose community placement. *Id.* at 587. The only question remaining is whether "the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with . . . disabilities." *Id.* Stated differently, the Defendants could fend off an attack on the sixty hour cap by arguing that accommodating the Plaintiff would require a fundamental alteration of the state's Medicaid program. *Id.* at 597.

A notable consequence of the Defendants' failure to apply the three-part *Olmstead* test is that neither the words fundamental alteration nor reasonable accommodation appear in the Defendants' brief.[3] The closest reference to a fundamental alteration defense comes in the

---

[3]The Court has considered the Plaintiff's argument that the Defendants have waived a fundamental alteration defense by not affirmatively pleading it. *See Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998) (describing the fundamental alteration defense as an affirmative defense); *Johnson v. Gambrinus Co.*, 116 F.3d 1052, 1059 (5th Cir. 1997) (defendant must "plead[] and meet[] its burden of proving that the requested modification would fundamentally alter the nature of the public accommodation"); *Steinle v. Warren*, 765 F.2d 95, 101 (7th Cir. 1985) (affirmative defenses not pled are waived); *see also* Fed. R. Civ. P. 12(b). The Court notes the Plaintiff has not pointed to a case where a fundamental alteration defense was considered to be waived for failure to affirmatively plead it. In any case, the Court need not reach the issue of waiver since the Court determines that the Defendants do not have a fundamental alteration defense. Finally, the Court notes that when viewed in a light most favorable

Defendants' attempt to distinguish *Crabtree v. Goetz*. The Defendants note that the *Crabtree* court struck down Tennessee's thirty-five hour per month cap on in-home nursing services provided under a Medicaid waiver program in part because Tennessee did not have a "plan 'demonstrat[ing] a reasonably specific and measurable commitment to deinstitutionalization for which [Tennessee] may be held accountable.'" *Crabtree v. Goetz*, No. Civ.A. 3:08-0939, 2008 WL 5330506, at *29 (M.D. Tenn. Dec. 19, 2008) (quoting *Frederick L. v. Dep't of Public Welfare*, 422 F.3d 151, 157 (3d Cir. 2005)). Evidence of such a plan would establish a fundamental alteration defense because if such a plan existed, then demanding that the state make modifications "would result in a 'fundamental alteration' of the state's . . . system." *Frederick L.*, 422 F.3d at 157; *Olmstead*, 527 U.S. at 605–06 ("If . . . the State were to demonstrate that it had a comprehensive, effectively working plan for placing qualified persons with . . . disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace . . . the reasonable-modifications standard would be met."). The Defendants argue that the Indiana waiver program is a plan demonstrating commitment to deinstitutionalization, and therefore the Indiana cap should stand where the Tennessee cap fell. The Court disagrees. The Defendants have not established a fundamental alteration defense; on the contrary, the facts before the Court show that the Indiana sixty hour cap is similar to the Tennessee thirty-five hour cap in that, far from establishing a fundamental alteration defense, it will have "the reverse effect to institutionalize the Plaintiff[]."

---

to the party not moving for summary judgment on this issue, the Defendants have pled and argued a fundamental alteration defense. They have done so by pleading the availability of prior authorization funding as an affirmative defense. (Defs.' Answer & Affirmative Defenses ¶ 7, ECF No. 24.) If the facts bore out such a theory, then requiring the Defendants to accommodate the Plaintiff's request would be a fundamental alteration of the state's program. Additionally, as articulated below in the discussion of *Crabtree v. Goetz*, the Defendants' Motion for Summary Judgment contains at least the hint of a fundamental alteration defense.

*Id.* at *30.

Moreover, the Plaintiff presents compelling arguments for why no fundamental alteration defense is available to the Defendants. First, the Defendants have not identified a single case where a state successfully relied on a fundamental alteration defense when the state was previously providing particular services to the Plaintiff in the community and later decided to curtail those services. In *Radeszewski*, the Seventh Circuit reversed the district court's summary judgment holding that the State of Illinois could not reasonably accommodate the plaintiff without a fundamental alteration of its Medicaid program. *See Radeszewski*, 383 F.3d at 615. Illinois had been accommodating the plaintiff in his home until his twenty-first birthday, but declined to offer the same number of hours of services once he reached age twenty-one. *Id.* at 602. The Seventh Circuit remanded to determine how much it would cost to continue to serve the plaintiff in his home, even though the plaintiff was asking the state to accommodate a level of in-home services that the state had never previously provided to individuals over the age of twenty-one. *Id.* at 609, 614. The Defendants' fundamental alteration defense is weaker than Illinois's fundamental alteration defense that was ultimately rejected in *Radeszewski*.[4] Though Illinois had served the *Radeszewski* defendant in his home until age twenty-one, the Illinois Medicaid program had never previously provided so many hours of services to adults, whereas the Indiana sixty hour cap curtails the exact services that were previously provided to the Plaintiff and other

---

[4]On remand, the district court rejected Illinois's fundamental alteration defense, holding that "the unrebutted evidence clearly shows that the cost of caring for [the plaintiff] in the proper institutional setting—a hospital—would be substantially greater than the cost of allowing [the plaintiff] to remain in the community and receive the same proper treatment and health care. Allowing [the plaintiff] to remain in the community can be readily accommodated, taking into account Illinois' resources and the needs of others with similar disabilities." *Radaszewski ex rel. Radaszewki v. Maram*, No. 01 C 9551, 2008 WL 2097382, at *15 (N.D. Ill. Mar. 26, 2008).

similarly-situated individuals. *See also Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1183 (10th Cir. 2003) (reversing district court's grant of summary judgment to the State of Oklahoma on a fundamental alteration defense and noting that the plaintiffs "are not demanding a separate service or one not already provided by the state").

Furthermore, the defendant in *Radeszewski* argued that the <u>cost</u> of accommodating the plaintiff would cause a fundamental alteration in the state's Medicaid program. Indeed, the Supreme Court has noted that cost is the key factor in a fundamental alteration defense. *Olmstead*, 527 U.S. at 603–04 (describing the fundamental alteration defense analysis as concerning "the allocation of available resources"). Yet the Defendants have expressly rejected a cost argument. As Karen Filler affirmed in her deposition, cost-feasibility was never part of the state's analysis about whether to provide services in the community under the waiver program. (Filler Dep. 18–19.)  Filler further stated that the sixty hour cap was "not meant to curtail any services to individuals, it was only meant to make sure that the proper funding sources were used." (*Id.* 128.) The Defendants argue explicitly that the sixty hour caps were instituted not out of a desire to cut costs, but merely to more appropriately pay for the same services with different funds. (Defs.' Br. Supp. Mot. Summ. J. 14.) The Defendants' argument puts this case squarely in line with *Helen L.*, where the Third Circuit rejected  the Commonwealth of Pennsylvania's fundamental alteration defense.  Pennsylvania was requiring the plaintiffs to receive care under its nursing home program instead of its attendant care program, 46 F.3d at 327, claiming that it would be a fundamental alteration of its attendant care program to ask it to accommodate the plaintiffs where the two programs were "funded on two separate lines of [Pennsylvania's] budget." *Id.* at 338. Just as Pennsylvania could not claim a fundamental alteration defense where the only required

18

alteration was a restructuring of budget line items, so the Defendants cannot claim a fundamental alteration defense where the only required alteration would be a restructuring of the budget vis-a-vis the waiver program and the Medicaid prior authorization system. *See also Townsend v. Quasim*, 328 F.3d 511, 517 (9th Cir. 2003) (reversing district court's grant of summary judgment to the State of Washington and district court's holding that state's failure to provide community based services was not an ADA violation where "the precise issue is not whether to provide the . . . services sought by [the plaintiff] . . . but in what location these services will be provided.").

Finally, the Defendants have not asserted that it will cost more to accommodate the Plaintiff and others similarly-situated in their homes than it would cost to meet their needs in an institutional setting. (Pl.'s Mot. Summ. J. 21.) As the *Olmstead* court articulated, a fundamental alteration analysis must include consideration, "in view of the resources available to the State, not only [of] the cost of providing community-based care to the litigants, but also the range of services the State provides others with . . . disabilities, and the State's obligation to mete out those services equitably." *Olmstead*, 527 U.S. at 597. The Seventh Circuit has interpreted this language to mean that a court must consider the costs of accommodating the plaintiff against the costs of serving others with disabilities similar to those of the plaintiff. *Radaszewski*, 383 F.3d at 614 n.5. The evidence before the Court is that it would cost significantly less to serve the Plaintiff and others similarly-situated in community settings than it would cost to institutionalize them. (CMS Approval Letter, Filler Dep. Ex. 8, ECF No. 39-4.) This, again, places the Plaintiff's claims squarely within the analysis of the Third Circuit in *Helen L.* There, the court noted the irony of the state's attempt to resist on the "justification of administrative convenience" an accommodation that would save the state considerable money, allow the plaintiff to continue

living at home and interacting with family, and not require a substantive change in the programs the state was already providing. *Helen L.*, 46 F.3d at 338. *See also Radaszewski ex rel. Radaszeswki v. Maram*, No. 01 C 9551, 2008 WL 2097382, at *15 (N.D. Ill. Mar. 26, 2008) ("The unrebutted evidence clearly shows that the cost of caring for [the plaintiff] in the proper institutional setting—a hospital—would be substantially greater than the cost of allowing [the plaintiff] to remain in the community."). The Defendants' attempt to resist accommodation of the Plaintiff is illogical for the same reasons, and does not form the basis for a fundamental alteration defense.

Because the Defendants have failed to show that accommodation of the Plaintiff would require a fundamental alteration of the state's programs, the sixty hour cap on respite services fails the *Olmstead* test and therefore violates the integration mandate of the ADA and the RA. Accordingly, declaratory and injunctive relief is proper on this basis as well.

## C.     The State Policy Violates State Medicaid Law

Indiana Medicaid law provides that state Medicaid services must include "limitations that are consistent with medical necessity concerning the amount, scope, and duration of the services and supplies to be provided." Ind. Code § 12-15-21-3(3). The Indiana Court of Appeals has called this statutory language "unequivocal." *Thie v. Davis*, 688 N.E.2d 182, 186 (Ind. Ct. App. 1997). "According to the statute, the State Medicaid coverage limitations must be 'consistent with medical necessity.' The statute thus establishes a precept: medically necessary treatment must be covered." *Id.*

The Defendants do not deny that the Indiana Family and Social Services Administration

has determined that more than sixty hours per month of respite care services are medically

necessary for the Plaintiff. The Defendants merely argue that there is no denial of medically

necessary services under Indiana Medicaid law because the needed services "may be reimbursed

either through the State's Aged and Disabled Waiver Program or through prior authorization

under traditional Medicaid." (Defs.' Br. Supp. Mot. Summ. J. 15.) The Plaintiff points out that

"[a]lthough the State vaguely asserts that no . . . individual is forced to go without medically

necessary services, the undisputed facts of this case demonstrate that persons *are* forced to go

without such services." (Pls.' Reply Supp. Mot. Summ. J. 24.) Specifically, as previously

discussed, the undisputed facts before the Court are that the Plaintiff is unable to obtain needed

services through the prior authorization program. Because the sixty hour cap has the effect of

depriving the Plaintiff of medically necessary services, the cap violates Indiana Medicaid law,

and declaratory and injunctive relief is appropriate in favor of the Plaintiff.


**D.     The State Policy and Federal Medicaid Law**

The Plaintiff argues, finally, that the state's sixty hour cap on respite care services violates

federal Medicaid law. Federal law requires that each service provided under state Medicaid plans

be "sufficient in amount, duration, and scope to reasonably achieve its purpose." 42 C.F.R.

§ 440.230(b). Furthermore, federal law allows "appropriate limits on a service based on such

criteria as medical necessity." *Id.* § 440.230(d). In *Weaver v. Reagen*, the Eighth Circuit noted the

Supreme Court's interpretation requiring that "a state Medicaid plan provide treatment that is

deemed 'medically necessary' in order to comport with the objectives of the Act." 886 F.2d 194,

198 (8th Cir. 1989) (citing *Beal v. Doe*, 432 U.S. 438, 444–45 (1977) ("serious statutory

questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage")).

The Defendants argue that because the sixty hour cap in question was approved by the Centers for Medicare and Medicaid Services (CMS), an agency within the Department of Health and Human Services (HHS), this Court should defer to the agency determination that the cap comports with state and federal Medicaid law. The Plaintiff argues that no agency deference is appropriate with respect to the statutes and regulations not administered by CMS, including the Indiana ARPA, the ADA and the RA, and Indiana Medicaid law. The Plaintiff argues further that no agency deference is appropriate on the federal Medicaid issue because CMS could not have known that the cap would have the effect of denying medically necessary services.

As an initial matter, the Court agrees with the Plaintiff that no agency deference is appropriate with respect to statutes not administered by CMS. CMS "is charged with administering the Medicaid Act," *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1235 (11th Cir. 2011), but no evidence before the Court suggests that CMS administers the Indiana ARPA, the ADA, the RA, or Indiana's Medicaid statutes. Thus, if agency deference to CMS is appropriate, it could only be on the agency determination that the sixty hour cap comports with the Medicaid Act.

CMS did make a determination that the waiver including the sixty hour cap on respite services comports with the Medicaid Act. (CMS Approval Letter, Filler Dep. Ex. 8, ECF No. 39-4.); *see also S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 595–96 (5th Cir. 2004) ("As the agency entrusted with the administration of the Medicaid statute, CMS is required to determine that each state plan is in conformity with the specific requirements of the Medicaid act."); *Cmty. Health*

*Ctr. v. Wilson-Coker*, 311 F.3d 132, 134 (2d Cir. 2002) ("[CMS] reviews each plan to assure that it complies with a long list of federal statutory and regulatory requirements."). Furthermore, the Defendants are correct that CMS, as the agency that administers the Medicaid Act, deserves deference when it interprets Medicaid regulations, so long as its interpretations are not "plainly erroneous or inconsistent with the regulation." *Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 643–44 (6th Cir. 2004) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)).

The Plaintiff argues that CMS did not have full information about the effect the cap would have on waiver enrollees. But the record does not show that the state was somehow deficient in submitting its request for approval to CMS. Nothing before the Court indicates that the state was required to submit additional studies on the long-term effects of the cap. On its face, it appears that the state complied with CMS requirements, and that CMS determined the state policy comported with federal Medicaid law.

The Plaintiff is entitled to declaratory and injunctive relief on other grounds, as explained above, whether the sixty hour cap violates federal Medicaid law or comports with federal Medicaid law. The Court, therefore, need not determine if the agency determination that the sixty hour cap comports with federal Medicaid law was correct.

## CONCLUSION AND ORDER

The Plaintiff is entitled to declaratory and injunctive relief because the sixty hour cap on respite services under the Aged and Disabled Waiver program violates the Indiana ARPA, violates the ADA and the RA, and violates Indiana Medicaid law. Accordingly, the Plaintiff's Motion for Summary Judgment [ECF No. 39] is GRANTED and the Defendants' Motion for

Summary Judgment [ECF No. 45] is DENIED.

The Court WITHHOLDS entry of any final order granting declaratory judgment and injunctive relief until it has conferred with the parties at a telephonic status conference to be held on November 29 at 11 AM. The Court will initiate the call.

SO ORDERED on November 16, 2011.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION